TECHNOLOGIES, V. YAHOO! Good morning, Your Honors, may it please the Court, my name is Jennifer Albert, I'm with the firm of Goodwin Proctor here today on behalf of the Appellant, AUGME TECHNOLOGIES and Wolf Talk Radio. This is an appeal from the Northern District of California Court's decision granting YAHOO!'s motion for summary judgment of non-infringement with respect to AUGME 636 and 691 patents. AUGME also appeals the District Court's finding that claims 19 and 20 of the 691 patents is invalid as indefinite. AUGME further appeals certain of the District Court's construction of terms of its claims as well as YAHOO!'s 320 patents. My argument today will focus upon the issues relating to the Court's grant of summary judgment of non-infringement. The inventions described and claimed in the AUGME patents relate to systems and methods... I can only speak for myself. The one issue I would like you, if you could, to look at is the question of whether the District Court erred in granting summary judgment of no DOE infringement with respect to the embedded limitation. Now, I realize that there's a difference of opinion here as to the construction of that limitation, but assume for the moment, reserving your objection to the construction, but assume for the moment that the District Court or the magistrate, was the District Court, did correctly construe that limitation. What in the record supports your position that there's a genuine issue of material fact as to no DOE infringement? I'm not talking about any issue here of vitiation, just a straight infringement issue. What do you point to? I mean, I know there's two items here. We've got the deposition of the YAHOO! expert and then the declaration of your expert in the record. If you could march through that and show me where there's a genuine issue as to the way. Well, there's no dispute here that the ad tags of the APT and the RMX first code modules are written into the HTML of the webpage prior to the initiation of the download. And we can... I think we actually know exactly how it works. What we're hoping you'll do is walk actually through the evidence and show us with precision where it creates a question of fact. YAHOO!'s expert, Dr. Gray, admitted during his deposition that the APT and RMX... What page would you like to look at? Page A6992 through A6994. Which statements? If you don't have it with you, get it. Which statements do you want me to understand? And again, the focus is on the way limitation, on the way prong of the three prong test, because there is some testimony in here about the same function, but at least I'm interested in the way point. Well, as to the way point, the accused YAHOO! systems function in the same way in that the first code module is inserted into the HTML of the webpage as the webpage is being executed. We don't want you to explain to us why you think it's the same way. We want you to show us where an expert gave concrete evidence that it operates in the same way. At page A6992, for example, starting at line 20 on that page, YAHOO!'s expert indicated that in response to the question, in the patent, the function performed... Ann, what is the way that that function is performed in the patent? In the patent, the function performed by the script.js? No, there's no script.js in the patent. I want to talk about the patent and then compare the function. And then the attorney said we're on the way. Yes, this is at page A6993. YAHOO!'s expert acknowledged that yes, it would be the same. It would be the same way. Well, it seems that the key part here is if there's enough there for you, the key part would be 6993 starting around line 16 or 17 going through, I don't know, I guess 6994 line 5 or 6. Correct. How is he explaining there that they operate in the same way, that the YAHOO!'s system operates in the same way as the claim, the embedded limitation? There is a statement if you declare the inclusion of the script source tag and declare it arbitrarily the first code module, then it would operate the same. That's lines 21 through 25 on 6993. But how does it talk there about explaining why that's the case? That seems sort of a conclusory statement. How does that – where do we have an explanation either here or in the other – your expert's declaration, which is at, I guess, 70 – the key part would be at 7060 through 7061 maybe. Again, I'm sorry for monopolizing the floor here, but this is the one issue that sort of – I was – The OGMI's expert explained that both – and a first code module that's entirely written in line into the HQR you're reading from. His testimony is the key – I'm sorry, it's the declaration. I think where you want to – you need to find something is at 760 through – 7060 through 7061, I think. And these seem to be the two places. What we looked at in the Yahoo expert's deposition in this section of the declaration. He says that on page A7061 at paragraph 21 that there's no substantial difference between using a first code module embedded in a webpage, which is inline code, versus using code that's partially embedded. For example, the Yahoo ad tag and – Are you talking about paragraph 21? I just want to make sure I'm with you. Correct. Page A7061, paragraph 21. It's on there. It says there is no substantial functional difference. And I think, you know, it's a three-pronged function, way, result. And we're just trying to get you to hone in on way. If you look at the prior page, A7060, for example, at paragraphs 16 through 18, Dr. Bhattacharjee explains that there's no substantial difference between inserting a portion of the first code module inline in the HTML of the webpage, which then retrieves another portion of the first code module from a server, and then copies and pastes that portion inline into the HTML of the webpage. And a first code module that's entirely written inline in the HTML code of the webpage prior to the beginning of the execution of the download. So that's the way part. Which paragraph gives me the way part? It's paragraphs of 16 through 18. Well, paragraph 17 is just disputing Yahoo's contention that using view source command available in the browser verifies partially embedded code. That doesn't have anything to do with whether these two things are the same way. I just want to, one by one, so it doesn't, does it? Correct. So it's not 17, it's 16 and maybe 18. 18, Dr. Bhattacharjee explains that in accordance with the World Wide Web Consortium, there's no distinction in behavior, in other words, the way that these things work, between code that's written entirely inline. Embedded. Inline means embedded, right? Correct. The judge construed embedded as written into the HTML code of the webpage. So there's no distinction between a first code module that's entirely written into the HTML code of the webpage prior to the beginning of the execution and a situation where there is a tag that is written inline into the HTML code of the webpage prior to the beginning of the execution, which then retrieves other code and inserts that code into the HTML of the webpage. I agree, and he does refer to the consortium document, which I guess we have at 7190, and most importantly, I guess, paragraph 18.1. And you're correctly quoting what he says there, but how does he explain why this is the same way? He says it makes no distinction, but why is there no distinction? Because the results are the same, in that in both situations, the code can be automatically executed as the webpage is being downloaded, and in both situations, the first code module, as it's being executed, can issue the command to retrieve the second code module or initiate. But that execution is different, isn't it? It's not executed in the same way. It is executed in the same way, because the way a browser parses the HTML of the webpage, it does so on a line-by-line basis. So as it encounters a command to retrieve code from a server, it goes and gets that code, retrieves it, and inserts it directly in that place inline. So it's the same as if you had written that entire... There's a middle process in the Yahoo! patent, isn't there? Pardon me? There's a middle process. There's another process in between the sending for the command for the ad. In the Yahoo! patent, there's a middle process there. In the Yahoo! networks, there is an ad tag inserted inline into the HTML code of the webpage prior to the beginning of the download, which then issues a call to go and retrieve smart code from the server. That smart code is then copied and pasted inline into the HTML code of the webpage as the webpage is being downloaded, which then issues the command to retrieve the second code module. So you would say there is a difference in the way that the two pens function? There's no substantial difference, because... There is a difference, but then the question becomes whether it's substantial or not, correct? Correct. But there is a difference? There is a difference, but a jury could reasonably determine that that difference is insubstantial as it relates to the requirements of the claim. In both circumstances, the first... So now show us the evidence that was presented that demonstrates that it's insubstantial, that the difference is insubstantial. Well, for example, Dr. Bhattacharya's declaration at page A7061, paragraphs 20-23, he's explaining that there's no substantial difference in the function and the results that are achieved in the Yahoo! context and those that would be achieved as if in a situation where the first code module is entirely written inline. But that's function and result, and I think what Jotrena was asking, unless I'm confused, is about ways, still, and whether or not it is an insubstantial difference, because we all agree there's a difference. Dr. Bhattacharya explains at page A7060, paragraph 18, that, for example, the World Wide Web Consortium makes no distinction in behavior or execution between JavaScript code written inline and code using the script tag containing the SRC attribute. We've exhausted all your time, almost all your rebuttal time, and I really would like to hear you address service response. So if you don't mind, can I move you on? I think you'd like that, wouldn't you, at this point? Yes, thank you. Thank you, Your Honor. Ogden contends that the district court impermissibly resolved disputed issues of fact in holding that the Yahoo! accused network's lack of service response. Why didn't you appeal the claim construction? The claim construction would be fine, but the court erred in applying the claims as construed to the accused Yahoo! network. Why is the claim construction fine to the extent that it requires an aspect of permission? I just don't read anything in this patent as requiring permission. So why in the world did you acquiesce and not appeal the claim construction? Well, it's Ogden's position that the display or lack of display of an advertisement does indicate whether or not the downloaded web page is permitted access to the requested function. I understand that's your argument as to why you think there's a question of fact even under the district court's construction. I just don't know why you haven't appealed this. It's not the construction you wanted. You didn't advocate for this construction, so I don't understand why you didn't appeal it, because I just have struggled to understand why permission is required when doing this patent. We felt that we could live with the construction at the time, and we felt that the Yahoo! network satisfied the construction. Well, how does a blank ad indicate permission as opposed to simply indicating perhaps that your system isn't capable of reading it? I mean, I get all these messages. I click on something. You don't have the right version of Adobe Flash to read this or whatever. That's not a lack of permission. That's not saying I don't have the right to do something. It's saying my system doesn't have the capability of doing it, which is quite different from permission. That is directly analogous to the situation in the patent. Oh, I know, but it has nothing to do with permission. I get that. It is an indication that your system lacks permission to access that particular function. Where does my system lack permission? It's actually telling me if I want to get it, just download this other thing. It's a capability question, not a permission question. It's a permission question in the same analogous situation as is given in the patent, in that a display of an advertisement does serve as an indication whether the download web page is permitted access to the advertisement. Why does the blank ad indicate anything about permission? That's what I don't understand. I understand that the blank ad is completely consistent with the specifications notice and service response, but unfortunately that's not what I'm looking at today. What I'm looking at is, is the blank ad consistent with the district court's instruction, which is not appealed. So why is the blank ad equivalent to permission? It's equivalent to an indication of permission in that if the ad is provided, that is, a reasonable jury could find that to be an indication that your system is permitted access, and if the ad server declines to provide an ad, that is an indication that your system is not permitted access to the ad. In the same way that the patent describes it, namely the service response is either provided or not provided. A jury could find that that is an indication of a grant or denial of permission. Just to the same extent as somebody walking in Central Park, that is an indication that you're permitted to walk in Central Park, but there's no affirmative indication provided to the user that permission was granted or denied. Well, but Yahoo's witness, 30B6, says that a blank ad code is returned when it's unable to fill an ad. Not when somebody doesn't have permission, but when they just simply can't find an ad for the person. So why would that necessarily correspond to a denial of permission? Because in that circumstance, there's no ad suitable to provide to that user, so permission to the added function is denied. Or a jury could find that to be the case. Robert, do you view the word permission in the computer field as sort of a term of art? In other words, when we think of permission in our daily discourse, we think you don't have permission to do it. I'm not going to let you do it. You can't do it. You don't have a ticket, whatever. Or you're not allowed to do that. Is that what we're talking about here? When you say you don't have permission, are you talking about you don't have the right script, or you're not allowed to go to this website, or both? It could be both in the context of the patent. The patent talks about access to the requested function with reference to the compatibility of the system to function that way. For example, if your system lacks the capability to display flash advertisements, then your permission to a flash advertisement would be denied. So it's a compatibility issue as well as a user preference issue that's described in the patent. But the claims here don't actually require there to be a checking for permission. It's just whether there's an indication. Correct, Your Honor. Thank you. We'll restore your rebuttal time, Ms. Albert. Ms. Maynard, go ahead. May it please the Court? Deanne Maynard for Apelli Yahoo. If I may start where the Court started with the doctrine of equivalent. Why is there not enough of a fact issue on way under the three-pronged test when you put together the materials that we were discussing with Ms. Albert, namely the testimony at deposition of the Yahoo expert, the declaration of the AWGMI expert combined with the consortium document? Well, this Court's case law that conclusory statements of experts are not enough to get you a jury question. We cite a case to that effect in our briefing, but also in this context in particular, in the DOE context, this Court's Texas Instruments case has been cited at least several times. Well, yeah, there's no question that that's black-letter law, and we've been pretty rigorous, I think, about applying it. But why, when you put all that together, when I say all of that, I'm talking about the sources that we were discussing with Ms. Albert. Why is there not enough there beyond conclusory statements? I mean, in other words, tell me what is conclusory about both the statement of your expert at deposition and the statement of the AWGMI expert in the declaration. The statement – I mean, starting with the AWGMI expert statement, it's hard to find a more conclusory statement than that in paragraph 22 on 7061, which is the only one that directly addresses way, Your Honor. And if I may read it, it says Yahoo's ad-serving systems perform the same function in substantially the same way to receive substantially the same results. I agree with you on that, but what about, say, like paragraph 18 on 7060? Paragraph 18, Your Honor, at best talks about result or function. It does not talk about way, and it refers to this World Wide Web document, which, when one looks at it, actually supports the notion that it's a different way. So on page 7190 to 7192, the discussion is one way to do it is to embed the code in line, and a different way to do it is to retrieve the code from somewhere else. Those are – the intermediary code for Yahoo, for example, the second modules are retrieved apparently in the same way, and that's sending a request to the server. I mean, ultimately, that's what happens. A request is sent to the server under both pens. But the way in which it's done, Judge Renia, is, in fact, diametrically opposite of what's claimed in the patent. So the claim in the patent is the first code module issues a command to retrieve the second code module, said second code module being downloaded and having the function. And that is diametrically opposed to the accused product, where the accused first code module is in line, but it retrieves something else. It retrieves an intermediary code that doesn't have the function. It has to be retrieved and downloaded from somewhere else. And then once it's executed, it goes and tries to get the requested ad. That is not in any way the same way, and there's nothing like what this court's case law requires. Texas Instruments, in fact, upholding – after a jury trial saying that very similar testimony by experts to these in the declarations here, which just sort of stating without any particularity why you would say this is substantially the same way. That is enough for DOE. And AWGME just doesn't have enough to take this to a jury. They just have nothing but – and as to our expert statement, Judge Schall, it is similarly conclusory and also just assuming counter to fact that the first code module – he was asked to assume, in answering the question, that the first and intermediary codes were one and that they were the same. And he said, well, if you assume that hypothetically, then it would be the same way. That's just saying, assuming you're right, AWGME, you would be right. That's not enough to get you to the jury. In fact, he completely disagrees with that being the same way. Let's go back to 7061, paragraph 21. Maybe the magic words aren't used correctly there, or maybe they're absent, but it says that there's no substantial functional difference between using a first code module embedded in a webpage under what the district court's interpretation includes in-line code versus using a code that is partially embedded. And it goes on and says, as done in webpages utilizing the accused products. It seems to me that there is – that is a declaration of function in the same way that perhaps raises a genuine issue of material fact for a jury. Well, I think that goes to function and not way. It uses the word function. And it doesn't – But it's speaking of retrieval on how the request is made to retrieve the in-at or assume a bad way in the end. In fact, the World Wide Web document that he points to suggests that there are actually two different ways to do it. One way, write it in-line, which is embedded, and another way is to retrieve it from somewhere else and download it. And the patent sets up a dichotomy, a binary dichotomy between those two things. And although I know, Judge Hull, you asked my counsel, Yosa, not to talk about the vitiation, but here it would go counter – and the district court was absolutely correct that it would be reading out structural limitations to this patent to allow a jury to conclude. Let me ask you, not to be a Johnny OneNote on this DOE issue, if I might, but what would you – in other words, posit for me testimony in a declaration or in a deposition that, in your view, would have gotten – would have gotten – over the fact issue on the waypoint? In other words, I'm going to ask you, if their expert or your expert had said what, what would have been enough in your view? It's hard to say what would be enough to get to a jury, Judge Hull, but it's very – To create a fact issue here on the waypoint. To create a fact issue, what this court's case law requires is sufficient particularity. Those are words from Texas Instruments to explain how it is that someone of skill in the art would think that they are substantially the same function, substantially the same way, substantially the same result. And these four sentences in this declaration can't possibly be enough particularity. In fact, this is very similar to the testimony that the experts gave in Texas Instruments. In other words, he's just set out his literal infringement case, and he says – and if you think it's not literal infringement, it's essentially the same, and so therefore it would at least be DOE. And that can't be enough to get to a jury. Let me ask you just one other thing. The district court on this point really focused on the vitiation point on the DOE issue. The magistrate didn't get into the kind of analysis that is presented in the briefs that we've been discussing with you and Ms. Alpert. Does that make any difference? No, I don't think it does. I mean I think the district court held for exactly the right reason. Oh, no, I understand. You would agree with the district court on the vitiation point, but I'm just saying does it make any difference? I mean we've been focusing to a large extent today on whether there was enough evidence to get to a jury on the way prong of DOE with respect to the embedded limitation, and the district court didn't go to that place at all. Does that make any difference? It doesn't, Your Honor, because the district court's rationale is one, independently proficient, and two, to the extent that this court is focusing on that issue, this court is obviously more than capable of locating the only three possible places in this record where they might have enough facts to get to a jury, and they just don't. So there's certainly no point in sitting back. Can I tell you the third response? Yes, please, Judge Moore. So even if you disagree with us on the doctrine of clemency, a completely independent way to affirm non-infringement here, and that is that there is absolutely no evidence of any indication of permission in the accused products. Why isn't sending the ad an indication of permission? Because the fact that the district court, absolutely correct, but the fact that an ad is sent tells you nothing about whether or not they checked to see if there was permission. As Judge Reina pointed out, don't require a check to see if there's permission, only an indication of permission. If I said, Ms. Maynard, can I have your pen, and you hand it to me, am I really to assume you're not giving me permission to take the pen from your hand? Well, I think that's different than here where we have a computer, which is required to see two things. There's two parts to the claim construction. Is the website that's requesting it, is it permitted to have the function? And if so, how is the function permitted? So the return of the ad, if anything, is the second piece. Wait, hold on. Where is that part? Remind me where that is. Where is the district court construction? I was focused on the permitted. It is on page... The analysis of the district court is on page 20, sorry. Maybe 47 to 50 of the record. Oh, I'm in the wrong patent. Apologies. Service response is a 49, and then the actual construction is on 50, A50. The court construes the term service response as a response that indicates whether the download web page is permitted to have access to requested function. And if yes, how the function should be presented on the web page. What are you reading? I'm sorry, I'm reading the district court's construction. It's the first line on page A50 of the district court's claim construction order. Okay. So there's two... What is it you think there are two... What is the two things? Well, the two things are a response that indicates whether the downloaded web page is permitted to have access to requested function. And if yes, how the function should be presented on the web page. And I was simply saying that to collapse the provision of the ad into the first part would collapse the analysis. The first part of the construction requires some permission element, and for there to be permission element... So the fact that people are in Central Park, Judge Moore... But the patent makes it clear that giving somebody an ad or media is an indication of permission. It is a service response. The patent makes that expressly clear. I disagree, Your Honor. And, you know, for one, just to step back, of course... Page, the column 7 of the 691 patent. At line 55 through 65. Right. So in context, though, in column 7, that is talking about after there's been a permission check. One of the results... But a permission check isn't required here by these claims. All that's required is an indication of permission. An indication of permission, which assumes that there has to be some sort of check. How else can you indicate permission if there hasn't been a check to whether or not you're permitted? By handing you my pen when you ask for it. But here we're talking about a computer who, in the passive, is checking to see if there is permission and then providing service response. And the claims here that you're reading here, the service response indicating denial of service. Denial of service is something more than just the absence of service. But how about granting service, right? Why isn't granting service... And maybe your argument is, okay, Judge Moore, maybe handing the ad could be possibly construed as service response, possibly under a factual scenario, possibly. But denial of service doesn't exist here. Is that what maybe your argument is? Well, I think there's two things here. The facts here show that the Yahoo Accused systems, they're agnostic about permission. The facts show that if there is an ad that meets the parameters, the systems will serve it. And if there isn't, they won't. Is a serving of the ad an indication of permission? No, it isn't, Your Honor. Because there's no evidence that the accused systems care anything about permission. So I do think that the requirement of permission does entail some sort of permission check. It does. Because otherwise, how can you read from the fact that a response is returned that there is permission? So to go to their hypothetical, the fact that people are walking around in Central Park says nothing about whether or not they're permitted to be there. It simply says they are there. Same with the provision of an ad. The provision of an ad just shows that I provide you an ad. It doesn't say I've checked to see if the webpage that's requested the ad is actually permitted to have the function, which is what the patent calls for. But the permission, to the extent that it exists in the function, doesn't seem to me to have anything to do with what I guess I would think of as traditional notions of permission. I mean, when I read this patent, I don't see a requirement along the lines of the way you want me to interpret the word permission. Well, but permission, the meaning of permission is that you either are granted or denied authority or access. I mean, they're often trying to read… Here's Yahoo! is granting access. So that you have therefore decided you have permission because they're granting it to you. They have decided not to withhold it from you by giving it to you. That would read out the requirement of permission, which does entail some kind of check. So if you look at page… if I can show you column 12, where they talk about… It's not a requirement. There's a requirement of indication. An indication in the service response, right? And I agree. It provides an indication in the service response that the webpage requesting the function is permitted to have the function. And the accused systems don't care about whether or not the requesting webpage is permitted to have the function. So if one looks at page 12, which I think… they haven't challenged the claim construction. Were you saying page 12 or column 12? I'm sorry. Thank you. Column 12. At page 27. That's what I'm looking at. Yes. Thank you, Judge. Column 12, line 52-ish, that paragraph, this is talking about the service response. And they haven't challenged the claim construction, but I think that the claim is correctly construed to have this kind of requirement. Every time there is a service response, one of the things is, of course, as discussed previously, if the service response is denial of service response, media application metaphor may be presented with a slash through it or may be absent from webpage. Denial. Denial of service response. Not just like I don't have an ad for you, but denial, which is permission in… a denial of an ad. Because that's what it is. You're talking about whether you can get the ad or not get the ad. The criteria under which that decision could be made are what you're suggesting are the indicators of permission. Perhaps my indication is only if you're over the age of 18. Perhaps yours is only if your system can accommodate the ad, i.e., you have the right software compatibility-wise. Why isn't Yahoo's system indicating permission when it determines whether it has an ad for you or not? Because that's not permission in the sense of the patent. Permission in the sense of the patent… But claims don't require permission. They require an indication of permission. But there is no indication of permission by Yahoo's return or non-return of an ad. If I can point to the evidence… That's exactly what this allows for. A service response, it can constitute a denial if you simply don't send something. Not in the context of the patent, because that's… And it's a reading from the patent, column 12, where you pointed me to. Column 12, which says, of course, as previously discussed, which goes back to column 7, which is what we were discussing before. Where it also says not sending something is a denial. But not sending something after having done a check as to whether or not you're permitted… The webpage that's requesting the function is permitted. Permission is required by these claims. So that's your problem. These claims aren't limited to that check being performed. What… Limited to only permission. And why can't permission be, I've got an ad for you or I don't have an ad for you? Factually, why not let the jury figure that out? It seems awfully close to me. I think that would read, is permitted, an indication that the website is permitted, out of the claim construction. And the claim construction is not challenged. Well, it isn't challenged. I get it. It's not challenged. It isn't challenged. Well, what if… I have one other question for you, which is, do you think this claim requires an indication of service response in every instance? Or what if the Yahoo system sometimes indicated service response and sometimes did not? The method claim. The… The method claim has to be inferred by the system every time it's operated? The facts are… No, I'm not… Okay. This is a simple question. I think the answer to that is no. So, a method claim doesn't have to be infringed by a… In order for a system to infringe, it doesn't have to perform every step every time. It just has to perform every step at least once, right? And the rest goes to damages in terms of how much. Does that sound about right? Yes, but here there's no evidence… So, if Yahoo ever, in any instance, is issuing a service response and we think there's a problem on embedded, then there's a question, right? They don't do it every time. But there are no facts in the record that the Yahoo accused systems care anything about permission ever, any time. And so, the most that they can point to on that is their conclusory testimony of their expert, again, which isn't enough. But the actual facts in the record are to the contrary. The actual facts in the record talk about whether or not there's a content ad of the type requested. It's not about permission. Do I have an ad? I serve it. It's about sending people ads. We want to send people ads. My question to you is, I feel like part of the problem with this permission language is that there aren't specific criteria articulated anywhere by which permission ought to be granted or denied, and that this patent seems to be directed entirely to tailoring ads or tailoring media for individuals. And so, I'm trying to figure out, well, what do they mean by permission? Because, again, we talked about could it be compatibility, could it be some criteria, like you're not over the age of 18, therefore I'm not going to send you a cigarette ad or whatever. I mean, is it – I'm trying to figure out what is the criteria by which permission is to be measured. And in the context of this patent, I guess the sense I have is do we have an ad that is appropriately tailored to you is an indication in this patent of what they mean by permission. And so, that's what I'm trying to understand. Well, I don't think that would be the right understanding of this patent, which is really about streaming media. And in column seven, you can see what they care about is whether – Is this an issue for the jury? No, Your Honor. This is a question – well, the claim petition we think is correct, and we think it requires that the service response indicate that the requesting website is permitted to have access to the function. And that makes sense in the context of this patent, because what they were talking about was streaming media that was going to appear often in the media metaphor on a website. And they might care about what kind of website it is. That's what the objectionable content check that they're talking about in. So, I don't think that the patent is talking about like you're talking about, Judge Moore, what our ads do, which is just the – they just – we just look to see whether or not we have the kind of an ad that fits the criteria you wanted. Do we have one? If we do, we send it. If we don't, we don't. Isn't fitting the criteria a permission in the context of the patent? No, Your Honor. I don't think it is. Whether the service – the service response is not a plain term, and it's been interpreted. It's been interpreted to say it, one, must first show an indication of whether or not the requesting website is permitted to have the function, and then, two, how that function should appear. And in the context of Claims 12 – and Column 12 and Column 7 makes clear that there's a denial of permission. The absence of a – providing the function is a denial of permission. That's not what's happening in the Q system. There's no denial. Permission and denial have certain meanings. You didn't answer Judge Reyna's question. I apologize. Why isn't the Yahoo system, which evaluates criteria and makes a decision on whether to send you an ad or not based on certain criteria, why isn't that evaluation effectively permission? Why can't it possibly, under a factual scenario, be construed as deciding whether you're permitted? Because the district court correctly concluded that whether – that just merely serving up an ad or not serving up an ad does not indicate anything about permission or denial of permission. And to allow a jury to conclude that would be inconsistent with the way the claim was construed and the claim construction has not been challenged. That's not deciding a fact question. That's the application of well-settled felitec summary judgment law. There isn't enough here to go to a jury. Do you have a closing comment? Either basis would be enough to affirm this judgment. We would request the court affirm it. Ms. Albert, we're going to restore your three minutes of rebuttal time. I think that keeps the time pretty equal. Thank you, Your Honor. Turning to the service response, I think Your Honors are correct that the district court took the factual issue away from the jury as to whether or not the provision or non-provision of an ad is an indication of whether the downloaded web page is permitted access to the requested function. And a jury could readily conclude, based upon the examples of the preferred embodiments provided in the specification, that the accused Yahoo network functioned in exactly the same way that's described in the patent. If I understand Ms. Maynard's argument, it is that while normally if I say can I have your pen and I hand you the pen, it might be an indication of permission, that that's actually not at all what goes on in the Yahoo website because they never deny anybody as long as they've got an ad for you, they want you to have it. So there is no aspect of denial. There is only tailoring an ad to someone, but that has nothing to do with permission. That's her argument. So providing it or not providing it isn't an indication of permission. But the problem is that the jury could have found as a matter of fact that the provision or non-provision of the ad was an indication of permission or denial. But only if Yahoo is evaluating something for permission, right? Something can't be an indication of permission if it's not actually ever happening. You can only indicate something if it's actually happening. Well, the Yahoo system is evaluating permission in the same way that the patent talks about evaluating permission. Namely, is there an ad that's compatible with the system? Is the website permitted to have access to this particular ad? Are the user's preferences such that this particular ad is permitted for that user? For example, if the user has some sort of adult content restriction preference, then the ad server will not serve an adult content ad to that particular end user. So you're basically saying, if I understand it right, that suitability is equivalent to permission. Correct. Compatibility, user preferences, that's what's discussed in the patent. Those are the same criteria that are evaluated by the Yahoo network in determining whether or not to serve an ad. And similarly, the district court took from the jury the factual issue as to whether or not the evidence was such that the jury could have found that the way that the Yahoo networks operate is not substantially different from the claimed embedded First Code module and that the Yahoo networks function in substantially the same way to achieve... Here's your last shot. Show us in the record the evidence of substantially the same way. It's the same evidence that we've been talking about, Your Honor, that the Yahoo... Something other than the experts saying it functions in the same way. What's the evidence? What's the step-by-step detail that indicates that? It's just the expert testimony and the fact that when you have the embedded ad tags, such as are used by the Yahoo network, there's no dispute here that the Yahoo systems embed the ad tags in the HTML code of the webpage prior to the download. Those ad tags call a second portion of code and retrieve that, and then that code is written in line in the HTML code of the webpage. There's no distinction between that situation. It's going to have the same lines of code as in a situation where that code was entirely written in line into the HTML of the webpage prior to the download. As it relates to the functions required by the claim, which is namely that the first code module be able to automatically execute as the webpage is downloaded, both situations function exactly the same way. In both situations, the code that's written into the HTML of the webpage includes the command to retrieve the second code module from the server. Now, but I guess what you'd be, to pick up on Judge Rainer's question for specific testimony, I guess what you would look to is paragraph 7 on 7058 with respect to the APT, and then paragraph 14 on 7060 with the RMX. Is that, because I think on this point, the service response, we don't have the situation that we do with embed, and correct me if I'm wrong please, where we had statements by the Yahoo expert in the deposition. But here, everything, whether it's enough or not enough on this point, would seem to be in the declaration of Mr. Bada Chargent. Is that correct? That's correct, Your Honor. And do we have, is that section of 7058 paragraph 7 through 7060 paragraph 14, that's where we have to find it if it's there? That, the paragraph 7 is talking about the service response. It's not really, I mean it's talking about the parsing procedure at the beginning of that paragraph. In other words, where in this do we, do we get over the fact issue requirement? And look at paragraph 11 on 7059 in that regard. Pardon me, I'm sorry. And also, as you answered Judge Schall's question, I want you to take a look at paragraph 11 of 7059. Right, yes. On page A, 7059, paragraphs 10 through 11, is talking about this, the fact that in the accused Yahoo system, there's the embedded ad tag that calls the other portion of the first code module from the Yahoo server. And then that causes additional code to be returned to the browser that's described in paragraph 11. And that is then written in line into the HTML code of the webpage. And then that second portion of the first code module contains the IMP call. And that IMP call is what calls the ad server to initiate retrieval of the second code module. So that functionality described at paragraph 10 and 11, a jury could reasonably conclude that that is not substantially different from writing that entire portion as if you wrote the ad tag and the smart code entirely in line in the HTML code of the webpage prior to the initiation of the download. In both circumstances, the browser parses that code on a line-by-line basis and executes it as it encounters it. And in both situations, that code module is automatically executed as the webpage is downloaded. And in both situations, the end result is that the command is issued to the ad server to retrieve the second code module. Give a final thought. Thank you.